FILED

09 MAY -4 PM 4:09

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

1  Vahn Alexander (167373)
   **FARUQI & FARUQI, LLP**
2  1901 Avenue of the Stars, Second Floor
   Los Angeles, CA  90067
3  Tel: (310) 461-1426
   Fax: (310) 461-1427
4  Email: valexander@faruqilaw.com

5  Maya S. Saxena
   **SAXENA WHITE P.A.**
6  2424 North Federal Highway
   Boca Raton, FL  33431
7  Tel:  (561) 394-3399
   Fax:  (561) 394-3382
8  Email: msaxena@saxenawhite.com

9  *Attorneys for Plaintiff*

10 *[Additional Counsel Listed on Signature Page]*

11

12              **UNITED STATES DISTRICT COURT**

13             **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 | MICHAEL SCHWARTZ, Individually and on Behalf of All Others Similarly Situated, | Case No. |
16 | | **'09 CV 0951 JM — BLM** |
17 | Plaintiff, | **CLASS ACTION** |
18 | v. | |
19 | SEQUENOM, INC., HARRY STYLLI, PAUL HAWRAN, ALLAN T. BOMBARD, CHARLES R. CANTOR, and ELIZABETH DRAGON, | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
20 | | |
21 | Defendants. | **JURY TRIAL DEMANDED** |

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff Michael Schwartz ("Plaintiff"), individually and on behalf of all other persons and entities (the "Class") who purchased or otherwise acquired securities issued by Sequenom, Inc. ("Sequenom" or the "Company") between June 4, 2008 and April 29, 2009, inclusive (the "Class Period"), by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on his investigation (made by and through his attorneys), which included, among other things, a review and analysis of: (a) public documents pertaining to Defendants (as defined herein); (b) Sequenom's filings with the Securities and Exchange Commission ("SEC"); (c) press releases published by Sequenom; (d) newspaper and magazine articles (and other media coverage) regarding Sequenom and its business; and (e) other publicly available information concerning the Company. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. However, Plaintiff believes that further substantial evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all purchasers of Sequenom's publicly traded securities during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Sequenom is a diagnostic testing and genetics analysis company which researches, develops, and pursues the commercialization of various non-invasive molecular diagnostic tests for prenatal genetic disorders and diseases, oncology, infectious diseases, and other diseases and disorders.

2.      As discussed in greater detail herein, the securities of Sequenom were artificially inflated throughout the Class Period as a result of violations of the federal securities laws arising out of Defendants': (a) dissemination of false and misleading statements concerning the Company's true financial and operating condition, and specifically test data and results regarding its SEQureDx Down syndrome test ("SEQureDx"); with (b) intentional and/or reckless disregard of the true condition of the Company.

3.     For example, after months of touting the Company's accolades, on April 29, 2009, Sequenom issued a public press release stating that its employees had mishandled R&D test data for SEQureDx, which was being developed as a non-invasive prenatal test for Down syndrome. On the same date, Sequenom also disclosed that the commercial launch of SEQureDx would be delayed and that: (1) the Company suspended four employees; (2) the Company formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results; (3) the committee engaged independent counsel to assist the committee in the conduct of the investigation; (4) the Company's previous press releases and public SEC filings concerning SEQureDx could no longer be relied upon; and (5) due to these developments, the Company is now reviewing the test results for *all* its products, not just SEQureDx.

4.     The market reacted swiftly to these shocking disclosures.  After trading as high as $29.14 per share during the Class Period, Sequenom's stock plummeted over $11.00 per share to as low $3.23 per share on April 30, 2009, almost an 80% decline on volume of more than 88 million shares. Moreover, certain analysts downgraded Sequenom common stock to "sell."

5.     In light of the foregoing, and as discussed in greater detail below, Plaintiff alleges that defendants failed to disclose material adverse facts about Sequenom's product line and prospects for the Company throughout the Class Period.  As such, Defendants' statements about the Company's financial well-being and future business prospects were lacking in any reasonable basis when made.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.     This action arises under §10(b) and §20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

7.     This Court has subject-matter jurisdiction over this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391.  Many of the acts and practices complained of herein occurred in substantial part in this District and Sequenom is headquartered in this District.

9.      In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## PARTIES

10.      Plaintiff Michael Schwartz, as set forth in the accompanying certification incorporated by reference herein, purchased Sequenom securities and has been damaged thereby.

11.      Defendant Sequenom is a Delaware corporation with its corporate headquarters located at 3595 John Hopkins Court, San Diego, CA 92121.  The Company is a diagnostic testing and genetics analysis company.  According to the Company's website, "Sequenom is committed to providing the best genetic analysis products that translate genomic science into superior solutions for biomedical research, agricultural applications, molecular medicine and non-invasive prenatal diagnostics research, and potentially, clinical utility.  The Company's proprietary MassARRAY® system is a high-performance DNA analysis platform that efficiently and precisely measures the amount of genetic target material and variations therein.  The system is able to deliver reliable and specific data from complex biological samples and from genetic target material that is only available in trace amounts.  The Company has exclusively licensed intellectual property rights for the development and commercialization of non-invasive prenatal genetic tests for use with the MassARRAY® system and other platforms."

12.      Defendant Harry Stylli ("Stylli") was, at all relevant times, President and Chief Executive Officer ("CEO") of Sequenom and a director of the Company since June 2005.

13.      Defendant Paul Hawran ("Hawran") was, at all relevant times, Chief Financial Officer ("CFO") of the Company, and has been since April 1, 2007.

14.      Defendant Allan T. Bombard ("Bombard") was, at all relevant times, Chief Medical Officer of Sequenom.

15.     Defendant Charles R. Cantor ("Cantor") was, at all relevant times, Chief Scientific Officer of Sequenom.

16.     Defendant Elizabeth Dragon ("Dragon") was, at all relevant times, Senior Vice President, Research and Development of Sequenom.

17.     Defendants Stylli, Hawran, Bombard, Cantor, and Dragon are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants were control persons of the Company, as alleged below, and were required to keep themselves informed of Sequenom's business on a daily basis. The Individual Defendants and Sequenom are collectively referred to herein as "Defendants."

18.     As alleged herein, Defendants acted with scienter in that they knew, or recklessly failed to know: (a) that the public documents and statements, issued or disseminated by or in the name of Sequenom, were materially false and misleading; (b) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As further stated herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Sequenom and its business practices, their control over and/or receipt of Sequenom's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company were active and culpable participants in the fraudulent scheme alleged herein. The scheme described herein could not have been perpetrated without the knowledge and complicity of personnel at the highest level of the Company, including the Defendants.

## SUBSTANTIVE ALLEGATIONS

19.     On June 4, 2008, Defendants issued a press release entitled *"Sequenom Announces Results of Screening Studies for Down Syndrome and Updates Development of Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing."* The press release stated in pertinent part:

> SAN DIEGO -- (BUSINESS WIRE) -- June 4, 2008 -- **Sequenom, Inc.** (NASDAQ: SQNM), a leading provider of genetic-analysis solutions, announced positive results from screening studies using the Company's noninvasive circulating cell-free fetal

(ccff) nucleic acid SEQureDx(TM) Technology, which enables the detection of fetal aneuploidy, including Down Syndrome from material blood.  At this analyst-and-investor briefing "The Future of Noninvasive Prenatal Diagnostics" held at the International Society of Prenatal Diagnostics (ISPD) conference in Vancouver, Canada, executives were joined by a panel of leading scientists and clinicians to discuss study results and updates in the development of noninvasive prenatal diagnostics.

The Company reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e., sensitivity or detection rate), without any false-positive outcomes (i.e., specificity), Population coverage for the T21 test improved to at least 93% of the U.S. population.  With currently available serum-testing options having detection rates between 70% to 90% and false-positive rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening.  The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners.  The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a laboratory Developed Test (LDT) in the U.S. in the first half of 2009.

"We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome that can be administered as early as late in the first trimester through a simple blood draw from the mother," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer.  "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes.  Also our coverage has improved to at least 93% of the U.S. population.  Although these results require further validation in larger studies, such results using SEQureDx™ Technology can potentially transform current clinical practice for Down syndrome-risk assessment.

The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients.  The blinded-prospective study involved 180 samples comprising 130 low-risk and 50 high-risk samples.  The test correctly identified three Down syndrome samples without any false-positive outcomes.  Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

"A direct noninvasive genetic assessment of fetal Down syndrome will result in far-better screening accuracy and would dramatically reduce the number of unnecessary, invasive diagnostic procedures that women undergo in current maternal serum-screening protocols.  Improved detection rates, as reported by Sequenom in its assay optimization studies, exceed those with currently available screening models," said Allan T. Bombard, M.D., a reproductive geneticist with more than two decades of experience in the field of prenatal screening and diagnosis.  (Dr. Bombard serves as a Chief Medical Director at Sharp Mary Birch Hospital and is the Principal Investigator of the study.)  "Moreover, having minimum false-positive results will significantly reduce the number of unnecessary confirmatory diagnostic tests, as well as the anxiety and complications associated with invasive procedures."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    5

Currently available tests conducted during the first or second trimester of pregnancy use epigenetic markers associated with the Down syndrome phenotype that are characterized as "surrogate" markers as they are not directly related to the extra Number 21 chromosome. Different combinations of markers, measured at different times in pregnancy, constitute a multiple-marker approach to screening. These tests have detected rates of 70% to 90% with approximately a 5% false-positive rate, while also having inconsistent population coverage or ethnicity rates. The SEQureDx test uses a maternal blood sample drawn as early as the first trimester and identifies directly the extra Number 21 chromosome. Invasive procedures such as amniocentesis or chorionic vallus sampling (CVS) carry risk of miscarriage and other risks to mother and fetus.

"Currently screening methods, using multiple 'surrogate' markers, are very good, but are unlikely to reach diagnostic potential," said Jacob Canick, Ph.D., Professor Pathology and Laboratory Medicine at Brown University Medical School. "In contrast, I am optimistic that tests using multiple-fetal RNA and DNA markers can be developed not only for Down syndrome, but for all clinically important aneuploidies, and it is reasonable to expect that such direct, noninvasive diagnostics could be done in the first trimester of pregnancy."

Sequenom's analyst-and-investor-briefing event speakers include Alan Bombard, M.D., Chief Medical Officer at Sharp Mary Birch Hospital, who discussed current clinical practices for Down syndrome screening and diagnosis; Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School, who discussed methods for screening pregnancies for Down syndrome; Professor Dennis Lo, consultant to Sequenom and a leading research in prenatal diagnostics, who discussed the future of prenatal diagnosis; and Sequenom's Senior Vice President of Research and Development Elizabeth Dragon, Ph.D., who reviewed progress with Sequenom's SEQureDx Technology in developing a test for Down syndrome. A webcast of the event is available on the Company Web site at www.sequenom.com.

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., a technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patient rights and patient applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from material serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights to territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

**About SEQureDx Technology**

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the

baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RhD incompatibility test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University. In these preliminary studies, data from more than 100 clinical plasma specimens of various ethnicities indicated that the development-stage Trisomy 21 test was approaching 85% (+/- 5%) ethnic coverage, more than 95% sensitivity and close to 99% specificity."

20.    After these statements were made to the investing community, the Company's stock price dramatically increased from $7.66 per share on June 3, 2008, to $12.83 per share, by June 9, 2008.

21.    On June 23, 2008, Defendants issued a press release entitled *"Sequenom Launches Public Offering of Common Stock."* The press release stated in pertinent part:

SAN DIEGO -- (BUSINESS WIRE) -- June 23, 2008 -- **Sequenom, Inc.** (NASDAQ:SQNM) today announced that it has filed a preliminary prospectus supplement to an automatically effective shelf registration statement with the Securities and Exchange Commission relating to a proposed public offering of 5,500,000 shares of its common stock. In connection with this offering, Sequenom plans to grant to the underwriters a 30-day option to purchase up to an additional 825,000 shares of common stock. All of the shares are being offered by Sequenom. Sequenom expects the net proceeds from the offering to be used for the development of diagnostic tests for use on its MassARRAY(R) system and other platforms, and for general corporate purposes.

Lehman Brothers Inc. and UBS Investment Bank are acting as joint book-running managers in this offering. The co-managers for the offering are Leerink Swann & Co., Inc., Lazard Capital Markets LLC, Oppenheimer & Co., Inc. and Rodman & Renshaw, LLC.

22.    According to a press release issued days later, on June 26, 2008, the offering would be sold to the public at $15.50 per share, which was near the 52-week high for Sequenom. Ultimately the offering was a financial success for the Company since it allowed Sequenom to raise net proceeds of *over $85 million.*

23.    In connection with the Offering, the Company filed a Registration Statement and Prospectus on June 23, 2008, as supplemented on June 26, 2008 (collectively referred to herein as the "Registration Statement") with the SEC.

1       24.   The Registration Statement contained untrue statements of material fact, omitted

2   other facts necessary to make the statements made therein not misleading, and was not prepared in

3   accordance with applicable SEC rules and regulations.  Among other things, these documents

4   failed to disclose Sequenom's inability to adequately control its employees handling of test data.

5   Further, the statements contained in the Registration Statement were false and misleading because

6   the Company failed to disclose that the clinical tests concerning SEQureDx were not being

7   conducted properly, that SEQureDx did not offer statistically significant improvement over

8   competing tests, and that due to problems with the clinical tests it was not feasible that Sequenom

9   would be able to bring this new test to the market in 2009.

10       25.   On September 23, 2008, Defendants issued the following press release entitled

11   *"Sequenom Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing."*

12   The press release stated in pertinent part:

> "SAN DIEGO & NEW YORK -- (BUSINESS WIRE) -- Sept. 23, 2008 --
> **Sequenom, Inc.** (NASDAQ:SQNM), a leading provider of genetic-analysis and
> molecular diagnostic solutions, announced additional, positive results from
> screening studies using the Company's noninvasive circulating cell-free fetal (ccff)
> nucleic acid SEQureDX(TM) Technology, which enables the detection of fetal
> aneuploidy, including Down syndrome from maternal blood, at its Analyst Briefing
> in New York City.  Among the data presented, Sequenom's test demonstrated
> complete concordance with clinical results (no false positives and no false
> negatives) in both first and second trimester samples (over 200 samples announced
> today and in excess of 400 prospective samples to-date).  Sequenom executives
> were joined by a panel of leading scientists and clinicians to discuss these study
> results and updates in the development of noninvasive prenatal diagnostics.

> "These data expand upon the data we announced in June and underscore the
> potential for our SEQureDx Technology to transform current clinical practice for
> prenatal diagnostics as a primary screening tool for Trisomy 21.  Furthermore, these
> results support the potential for our test to be used in the first trimester," said Harry
> Stylli, Ph.D., Sequenom's President and Chief Executive Officer.  "In addition, our
> announcement earlier today regarding our acquisition of the Center for Molecular
> Medicine, a CLIA-certified molecular diagnostics laboratory, and our partnership
> with Spectrum Health and the Van Andel Research Institute, provides us with
> important infrastructure and commercialization control.  We are delighted with our
> progress in bringing to market an important, noninvasive screening test for Down
> syndrome, as well as a broader menu of molecular diagnostic tests.  These results
> are very promising, and we look forward to continuing the clinical development and
> validation progress to launch in the first half of 2009."

> Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at
> Sequenom, presented data from blinded studies performed at Sequenom involving
> 219 new clinical samples collected prospectively, showing that its proprietary test
> for Down syndrome correctly identified 100% of all Down syndrome samples (i.e.,

sensitivity or detection rate), without any false-positive outcomes (i.e., specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires that harvesting of placental tissue cells.

Sequenom indicated that with the addition of new SPNs in PAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the U.S. population. The Company has also identified novel markers for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009. To facilitate the LDT validation study, Sequenom also indicated that the company will be collaborating with new clinical partners who perform in excess of 12,000 amniocenteses and 3,000 CVS per year. In addition, Sequenom announced sponsorship of the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party.

During the Analyst Briefing, management also highlighted key upcoming milestones for the prenatal diagnostics business, including:

-- Confirm 10-week or earlier gestational age testing

-- Evaluate integration of T18 (Edward's syndrome) assay into the first generation test

-- Initiate T21 LDT clinical validation study evaluating 3,000 to 5,000 samples

-- Complete T21 testing of up to 800 additional high prevalence specimens by year-end 2008

-- Initiate "RNA" multi-center study involving 10,000 high prevalence patient samples

-- Submission of key data for publication

-- Commercial launch of T1 test in first half of 2009

Sequenom's analyst briefing included the following speakers and topics:

-- Harry Stylli, Ph.D., Chief Executive Officer, Sequenom Business Overview and Update

-- Charles R. Cantor, Ph.D., Chief Scientific Officer, New applications of the Sequenom Platform

-- Yuri Khudyakov, Ph.D., Chief, Molecular Epidemiology and Bioinformatics Laboratory, Division of Viral Hepatitis, Centers for Disease Control and Prevention, Novel Molecular Technologies for Public Health

-- Betty Dragon, Ph.D., Senior Vice President, R&D, Noninvasive Prenatal Detection of Genetic Abnormalities Using SEQureDx(TM) Technology

-- Danial H. Farkas, PhD, HCLD, FACB, Executive Director, Center for Molecular Medicine, Real-world Genetic Testing: Translating Science Into Routine Clinical Tests

-- Gary S. Riordan, Vice President, Regulatory Affairs and Quality, FDA Regulatory Environment

-- Jacob A. Canick, Ph.D., Professor of Pathology and Laboratory Medicine, Brown University Medical School, Design And Implementation of a Landmark, Multicenter, Prospective Clinical Study To Validate The Safe And Accurate Detection Of Down Syndrome Using SEQureDx(TM) Technology

-- Allan T. Bombard, M.D., FACOG, FACS, FACMG, reproductive geneticist, Chief Medical Officer, Sharp Mary Birch Hospital: Are We Facing a Revolution in Noninvasive Prenatal Genetic Diagnostics?

A record of the webcast of the event will be available on the Company Web site at www.sequenom.com until October 7, 2008.

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United Sates, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

**About SEQureDx Technology**

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the

PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University."

26.    After the foregoing statements were disseminated to the financial community, Sequenom's stock increased from $20.56, on September 23, 2008, to close at $27.76 on the following day.

27.    Thereafter, on December 1, 2008, Defendants issued the following press release entitled *"Next-Generation Noninvasive Diagnostic Technology Shown to Accurately Detect Fetal Down Syndrome in First Trimester of Pregnancy."* The press release stated in pertinent part:

> "SAN DIEGO -- (BUSINESS WIRE) -- Dec. 1, 2008 -- **Sequenom, Inc.** (NASDAQ:SQNM) announced new data from a collaborative project with The Chinese University of Hong Kong, published this week in the Early Edition of the Proceedings of the National Academy of Sciences, that demonstrate its innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for fetal Trisomy 21, or Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures.
>
> This study used massively parallel genomic sequencing to quantify maternal plasma DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing samples from 28 women in the first and second trimesters of pregnancy. All 14 Down syndrome fetuses and normal fetuses were correctly identified at these early stages.
>
> "Current invasive methods for diagnosing Down syndrome in pregnancy have documented risks associated with such procedures. Our new study using massively parallel genomic DNA sequencing represents a 'next-generation' technology for noninvasive, safe testing of Down syndrome. This is the first study to show that this approach can be used for the detection of Down syndrome in both the first and second trimesters, based on a rigorously controlled clinical cohort in which the pregnant women with fetuses affected by Trisomy 21 and those with normal fetuses were matched in gestational age, and in which most of the studies subjects had not previously undergone an invasive procedure. The latter point is important as it shows that the method would truly work in the noninvasive prenatal diagnostic scenario. This study also employs a novel data analysis algorithm which has achieved an unprecedented clear separation of the Trisomy and normal samples," stated Dennis Lo, M.D., Ph.D., co-author of the study, and Li Ka Shing, Professor of Medicine at The Chinese University of Hong Kong. "While this new approach is several years away as a commercially viable test, we believe that massively parallel genomic sequencing of DNA in maternal plasma may offer a complementary approach to the RNA SNP allelic ratio approach that we reported last year for Trisomy 21 detection. The two approaches have performance and cost profiles which would potentially be synergistic to one another."

Sequenom licensed the exclusive rights to the massively parallel genomic DNA sequencing technology featured in this study from The Chinese University of Hong Kong in September 2008.

"Screening tests currently available for early detection of Down syndrome and other chromosomal disorders are associated with a relatively high rate of inaccuracy, which can result in an overlooked abnormality or, in the case of false positive results, unnecessary invasive and risky procedures," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Systems to support DNA sequencing like massively parallel genomic sequencing or shotgun sequencing are currently limited to the academic setting due to scalability limitations and high cost, therefore practical applications are several years from commercialization. We find the data reported by Dr. Lo and associates to be very compelling and, while we continue to evaluate other promising approaches, Sequenom licensed this technology several months ago because we believe massively parallel genomic sequencing is a promising approach to prenatal diagnostics that may offer a future extension to our SEQureDx(TM) prenatal diagnostics franchise. Even though this technology is years away from the clinic, we expect that our current RNS SNP allelic ratio technology - which is the basis for the Down syndrome test we expect to launch in June 2009 - will represent a major step forward in maternal and fetal testing."

Current screening technology for Down syndrome includes serum marker analysis, such as the quad screen and first trimester combined screening that employs both serum marker testing and nuchal translucency. These approaches have detection or sensitivity rates of 80% and 85% respectively, which means between 15% and 20% of all Down syndrome-affected pregnancies will not be identified as needing further evaluation. In addition, these approaches also have false positive rates between 5% and 10%, resulting in hundreds of thousands of unnecessary, highly invasive CVS or amniocentesis procedures. These invasive procedures, which are used to determine whether a fetus has Down syndrome, carry a risk of miscarriage in the range of one-in-100 to one-in-300.

The study, entitled "noninvasive prenatal diagnosis of fetal chromosomal aneupliody by massively parallel genomic sequencing of DNA in maternal plasma" by Chiu et al., is available online in this week's Early Edition of PNSAS at www.PNAS.org.

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license right are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization

of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY(R) platform.

**About SEQureDx Technology**

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through a laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States.

Sequenom continues to make substantial progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo. Recently, Sequenom announced initiation of a 16-month RNA-based Noninvasive Aneupliody (RNA) study to evaluate its Trisomy 21 technology performance in up to 10,000 women with high-prevalence pregnancies within the first trimester. Led by Drs. Jacob Canick, Ph.D. and Glenn Palomaki from Women & Infants Hospital at Alpert Medical School of Brown University in Providence, Rhode Island, the study's primary goal is to document the performance (clinical sensitivity and false-positive rate) of Sequenom's Trisomy 21 technology that uses fetal RNA in maternal plasma to identify Down syndrome in early pregnancy. The study is expected to be completed post-launch of the Trisomy 21 test.

28. On January 28, 2009, Defendants issued the following press release entitled *"Sequenom Announces New Positive Data on Down Syndrome Detection and Unveils Breakthrough DNA Approach to Prenatal Diagnostics – Data Continue to Support Significant Market Potential for Sequenom Prenatal Franchise; Down Syndrome Test on Track for Launch in June 2009."* The press release touted the progress of SEQureDx and stated in pertinent part:

SAN DIEGO -- (BUSINESS WIRE) -- **Sequenom, Inc.** (NASDAQ:SQNM) today announced new positive data from the prospective clinical studies using the Company's noninvasive SEQureDx™ technology, enabling the detection of fetal aneupliody from maternal blood. The data presented today consist of 459 new, high prevalence samples from the prospective, blinded studies performed at Sequenom, bringing the total number of samples studies to 858. Based on the results from the total study samples, including samples as early as 8 weeks of pregnancy, the Sequenom SEQureDx RNA-based technology demonstrated a 100% positive predictive value (PPV) and a 99.9% negative predictive value (NPV). The SEQureDx technology achieved a better than 99% detection rate, with less than a 1% false positive rate. The current standard of care, screening tests, perform at less than a 99% detection rate, their false positive rate would be in the 10% to 25% range. SEQureDx compares favorably to the current invasive procedures, such as amniocentesis.

In addition to data on the RNA-based technology, the Company unveiled a breakthrough technology which further enhances Sequenom's SEQureDx technology. This new DNA approach has demonstrated in early studies universal ethnic coverage, high sensitivity and specificity, and the ability to detect Trisomy 21 (Down syndrome), Trisomy 18 (Edward's syndrome) and Trisomy 13 (Patau syndrome) in a single test. This technology is being developed as a "reflex test" for unresolved results from the current SEQureDx Trisomy 21 technology will be available at the time of the launch of the Trisomy 21 laboratory developed test (LDT) in June 2009.

"We are very pleased with the completion of the R&D studies for our Trisomy 21 RNA-based technology," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom.   "Our highly sensitive and specific Down syndrome technology will be transferred to the Sequenom Center for molecular Medicine (SCMM) to complete the development and validation phases necessary for launch in June as an LDT.  Our pioneering DNA approach is proving to be a powerful approach to detecting a wide range of aneupliodies.  We are very excited by these early findings and believe it will play a key role in our prenatal diagnostics franchise as it eliminates unresolved results due to ethnic coverage and has shown sensitivity as early as eight weeks, similar to the current RNA approach.  Furthermore, we believe it will have broad applicability in other areas such as cancer aneupliodies and other genetic disorders.   This new approach and other approaches being developed by the Company are covered by existing and recently filed patents."

**Overview of Data from Screening Studies Evaluating RNA-based Trisomy 21 Technology**

Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 459 new, high prevalence clinical samples collected prospectively, which brings the total number of samples studies to 858.  The data from the 459 new samples show that Sequenom's proprietary technology for Down syndrome correctly identified all eight first trimester Down syndrome samples (i.e., sensitivity or detection rate) with no false positives and no false negatives, as confirmed by chorionic villus sampling (CVS).  Of the 15 second trimester confirmed Down syndrome samples, the Sequenom RNA-based technology detected 14 samples, with one unresolved result reflexed to the new DNA-based method.  The DNA-based method accurately detected the Down syndrome.  There was one false positive in the second trimester samples, which would be reflexed for confirmatory genetic testing per American College of Obstetricians and Gynecologists (ACOG) guidelines.

"These results represent a significant advance in noninvasive prenatal screening," stated Allan T. Bombard, M.D., Chief Medical Officer of Sequenom. "In Light of these outstanding results, the SEQureDx RNA-based Trisomy 21 technology clearly represents a paradigm-shifting approach.  I am encouraged by the single false-positive result in this study representing one tenth of one percent of the total samples tested to-date, and the detection rate is notably superior to the current standard of care, biochemical screening tests.  As an ob-gyn, I am confident the simplicity of the SEQureDx approach will be invaluable to physicians and the patients they care for and will result in substantially fewer invasive procedures."

**Breakthrough DNA Approach to Detection of Trisomy 21 and Other Aneupliodies**

In addition, Dennis Lo, M.D. Ph.D., Li Ka Shing Professor of Medicine at The Chinese University of Hong Kong, presented insights in future opportunities for noninvasive prenatal diagnostics, including pioneering work in a novel DNA approach to the detection of fetal aneuploidy, an approach which Sequenom is already evaluating in R&D studies.

Dr. Dragon from Sequenom presented early findings regarding this promising technology from 369 samples. These findings showed that the DNA-based method correctly identified all 68 unresolved results reflexed from the RNA method, including one confirmed positive Trisomy 21 sample. In addition, this method correctly identified four confirmed positive Trisomy 13 samples and four confirmed positive Trisomy 18 samples.

"We believe this technology represents a breakthrough approach for detecting chromosomal aneupliodies," stated Dr. Dragon. "This method provides a universal method for detecting all chromosomal aneupliodies. This simple integration into RNA lab workflow is this MassARRAY-based technology does not impact timelines or costs. We will continue to evaluate this technology in parallel to the RNA method and plan to incorporate the DNA-based method into our launch plans."

**Future Applications in Detection of Monogenic Diseases**

During his presentation, Dr. Lo focused on the future potential for Sequenom's technology to address the unmet needs in detection of monogenic diseases. Currently, monogenic diseases, such as cystic fibrosis, B-thalassemia and sickle cell anemia, can only be definitively diagnosed prenatally through invasive procedures following extensive carrier screening testing on both parents. In the United States, cystic fibrosis screening is recommended for all women of children bearing age (more than 10 million individuals in the U.S. are carriers of the CF mutated gene, including one in every 9 Caucasian Americans) and in certain regions of the world, B-thalassemia affects anywhere from three to 16 percent of the population.

Data presented by Dr. Lo demonstrate that when individual mutant or normal DNA sequences are counted in maternal plasma using digital PCR technology, the number of mutant genes inherited by an unborn fetus, and hence its disease status, can be determined. He further demonstrated that a 'molecular counting' strategy can be made more efficient by taking into account the length of the DNA molecules in maternal plasma, as fetal DNA molecules are known to typically be shorter than the maternally derived molecules in maternal plasma. This digital counting approach enables the noninvasive diagnosis of B-thalassemia and hemoglobin E disease from maternal plasma—forms of inherited anemias that affect millions of people worldwide. This molecular counting strategy can, in principle, be applicable to all forms of monogenic diseases, namely paternally or maternally inherited, autosomal dominant diseases and autosomal recessive diseases with any combination of parental mutations. Thus, this complete diagnosis of monogenic diseases can be achieved noninvasively. Sequenom holds exclusive rights to this breakthrough technology representing a new approach that could potentially eliminate the need for paternal testing and significantly reduce the use of invasive tests.

"This new diagnostic approach addresses a problem that has been puzzling investigators in the field of noninvasive prenatal diagnostics over the last 10 years,"

stated Dr. Lo, study co-author. "Digital PCR technologies have enabled us to measure the minute imbalance of mutant and normal DNA sequences in maternal plasma. This has freed us from the past restriction for monogenic disease analysis where we could only look at the paternally-inherited mutations noninvasively. This research represents a significant paradigm shift in the way we approach plasma DNA-based diagnostics, and offers substantial promise for bringing noninvasive prenatal diagnosis of monogenic diseases closer to reality."

"Sequenom is committed to developing the next generation of prenatal diagnostic tools that will provide physicians with the capabilities they need to noninvasively diagnose genetic disorders early in a woman's pregnancy," commented Dr. Stylli. "We believe these unique, noninvasive digital technologies have the potential to dramatically impact the prenatal diagnostic market and we look forward to advancing these innovative approaches as part of our long-term strategy to expand our prenatal diagnostics franchise."

Sequenom's analyst briefing included the following speakers and topics:

- -- Sequenom Business Overview and Update, Harry Stylli, Ph.D., President and Chief Executive Officer

- -- Trisomy 21 R&D Study Results, Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development

- -- Glimpse into the Future of Aneuploidy Screening, Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development

- -- Impact on Clinical Practice, Allan T. Bombard, M.D., Chief Medical Officer

- -- Understanding the Regulatory Landscape, Gary Riordan, Vice President, Regulatory Affairs and Quality

- -- Future Applications in Noninvasive Prenatal Diagnostics, Dennis Lo, M.D., Ph.D., Professor of Medicine at The Chinese University of Hong Kong

A webcast of the presentation will be available for 90 days following the event on the Company's Web site at www.sequenom.com.

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company at the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based RhD tests) for development and commercialization of

noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform."

29.  On February 3, 2009, Defendants issued a press release entitled *"Sequenom Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM – Company Provides Additional Details on SEQureDx Trisomy 21 Technology Performance Data."* The press release announced further progress on the clinical trials involving SEQureDx and continued to predict commercial launch of the test in June 2009.  The press release stated in pertinent part:

> SAN DIEGO--(BUSINESS WIRE) -- **Sequenom, Inc.** (NASDAQ:SQNM) today announced new data showing the discovery of DNA methylation markers for Trisomy 21 (Down Syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) and identification of chromosome RNA-SNP markers for early detection of Trisomies 18 and 13.  The data were presented on Thursday and Friday, January 29 and January 30, 2009, at the 29[th] annual meeting of the Society for Maternal-Fetal Medicine (SMFM).  In addition, Sequenom announced more information regarding the performance of its Down syndrome test at a separate meeting held concurrently in San Diego.
>
> "Sequenom is committed to reinforcing its leadership in the noninvasive prenatal arena with innovative, proprietary technologies for chromosomal disorders, and monogenetic, polygenic diseases using discrete and whole genome approaches," said Harry Stylli, Ph.D., President and Chief Executive officer of Sequenom.  "Our discoveries regarding new DNA methylation and RNA-SNP markers for Trisomies 21, 18, 13 will help expand our future assay offerings.  Also, our new, proprietary DNA-based testing method, which was presented at our analyst meeting, complements our RNA-based strategy, especially as a reflex for homozygote no calls.  The DNA-based method has the potential to work universally for T21, T18, T13 and gender determination in a single tube."
>
> In an oral session presented at the SMFM meeting, Mathias Enrich, M.D., Scientific Group Leader of Sequenom, highlighted the discovery of DNA methylation markers for prenatal aneuploidy testing in a presentation entitled "Discovery of DNA Methylation Markers for Prenatal Aneuploidy."  The genome-wide methylation analysis identified more than 3,000 differentially methylated regions with approximately 90% confirmation; study results showed proof-of-concept for the sensitive detection of aneuploidies.
>
> In a poster session at the SMFM meeting entitled "Identification of RNA-SNP Markers for Noninvasive Prenatal Diagnosis (NIPD) of T18 and T13," an exon array was utilized to compare gene expression profiles and identify SNPs using matched placenta and maternal PBMC RNA samples.  All SNP candidates were then screened using 100 human diversity genomic DNA samples of various ethnicities to measure the heterozygote rate (HR) for each SNP.  SNPs with an HR of 4 percent or greater were retested using placental RNA samples.  Four SNPs from one C13 gene and three C18 genes were selected for assay development base-d on positive placental RNA results and additional SNPs within these genes will be

validated to expand population coverage for T13 and T18 screening using the RNA-based method.

The RNA, DNA and methylation marker variations of the SEQureDx ™ Technology are being developed in parallel and may be validated in the same studies. All may ultimately be commercialized and prove complementary in some or all patients.

**Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Trisomy 21 Technology**

During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome. The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studies to 858. The test correctly identified all 22 T21 positive samples from 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (*i.e.* 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis. The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

-- Specificity of 99.7% (98.4% - 100%) and 100% sensitivity (85.1 - 100%) at a 95% confidence interval;

-- The Positive Predictive Value is 95% (79.0%-99.8%) and the Negative Predictive Value of 100.0% (98.9% - 100%) at a 95% confidence interval;

-- The SEQureDx RNA test had a total of 85 unresolved results ("no-calls") due to homozygotes (80) and unacceptably low RNA levels (5) for a total of 18.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;

-- The distribution of the 459 samples actually collected as compared to the expected rate in the U.S. population was Caucasian (282 vs. 307), Asian (101 vs. 20), African American (12 vs. 62) Hispanic (62 vs. 68) and Native American (2 vs. 3).

"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June," said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes. We expect that in the final test, ethnic coverage will be better than 95% of the U.S. population. Identification of additional SNPs by ongoing sequencing of the relevant genes of homozygote patients, coupled with modest improvements in marker recovery, will further expand the ethnic coverage of the RNA-based test.

"Furthermore, when compared to amniocentesis or CVS, the new DNA-based method correctly identified all 68 homozygotes tested including a no-call T21 sample and a no call T18 sample. The DNA-based test shows great promise as a

reflex to the RNA method or potentially as a front-line test in its own right," added Dr. Dragon.

Based on the results from the 858 total study samples, the Sequenom SEQureDx RNA-based technology demonstrated:

-- Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% - 100.0%) at a 95% confidence interval;

-- The Positive Predictive Value is 96.6% (82.8% - 99.8%) and the Negative Predictive Value of 100.0% (99.5% - 100%) at a 95% confidence interval;

-- The SEQureDx RNA test had a total of 106 unresolved results ("no calls") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. The DNA-based method, when applied, resolved all no calls;

-- SEQureDx is considerably more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99%)."

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are based upon its intellectual property rights including, but not limited to, the pioneering inventions and associated intellectual property rights exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as from The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY® platform.

30.    Yet after months of touting SEQureDx, on April 29, 2009, Defendants shocked the investing community by issuing a press release entitled *"Sequenom Announces Delay in Launch of SEQureDx Trisomy 21 Test."* The press release stated in pertinent part:

SAN DIEGO--(BUSINESS WIRE)--Apr. 29, 2009-- **Sequenom, Inc.** (NASDAQ: SQNM) *announced today that the expected launch of its SEQureDX™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D test data and results.* Sequenom has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to have a validated test in the fourth

quarter of 2009. *Under the circumstances, and as supported by key clinical opinion leaders, the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be practice-changing for Down syndrome testing.*

*The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.*

Although the company is not aware of any potentially inappropriate activity related to the reported results of its other tests under development, *the company is currently reviewing the data for all tests.* As a result of this ongoing review of the Rhesus D, Cystic Fibrosis and FetalXY tests are now anticipated to begin launching in the third quarter of this year.

The company believes that its Down syndrome program has suffered a temporary setback but that the SEQureDx technology is scientifically and technically sound. The company intends to take every possible action to make up lost ground. Sequenom believes that it has the financial resources to commercialize its test for Down syndrome and other prenatal disorders.

*Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.* [1]

31.     On this news, the price of Sequenom's stock fell more than $11 per share to a low of $3.23 per share. *This was almost an 80% decline in share value on volume of more than 88 million shares.*

32.     Further, in light of the foregoing, the Company's June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009, and February 3, 2009 press releases were false and misleading when issued. Defendants knew such statements were false due to known, existing material defects with the Company's clinical trials, including but not limited to the clinical studies being conducted in San Diego. Defendants also knew that employees were mishandling the test data and results for SEQureDx, that SEQureDx did not offer significant improvements over existing tests, and that Sequenom would not be in a position to achieve commercial launch of the test by June 2009. Nonetheless, Defendants continued to represent contrary facts to the market and to Sequenom's public shareholders.

---

[1] At all times, emphasis is added unless otherwise indicated.

33.    The negative reaction of analysts who follow Sequenom was also swift.  "I don't believe the product will ever launch," noted Brean Murray Carret and Co. analyst Jonathan Aschoff ("Aschoff").  Aschoff further stated in pertinent part:

> *"We seriously doubt that a timeline can be put forth when all of the RNA and DNA data generated to date is now questionable,"* he added.

> Aschoff said although the company plans to launch the test upon publication of ongoing trial results in a peer-reviewed journal, he finds it *"almost impossible to have faith in those results given the recent developments."*

> Collins Stewart analyst Keay Nakae said, with data from the company's research and development laboratory losing their value, there would be lesser interest in participating in the company's clinical studies.

> *Any review will now be subject to a higher level of scrutiny and therefore will be more thorough and take longer to be signed off on before it can be published,* Nakae added.

> *"We believe that under the most optimistic scenario, the test would not be launched until 2011,"* he said, downgrading the stock to *"sell."*  Brean Murray's Aschoff, who called the Down Syndrome test *the company's "crown jewel,"* does *not think Thursday's sell off was overdone.*

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action pursuant to *Federal Rules of Civil Procedure* 23(a) and 23(b)(3) on behalf of a class of all persons (the "Class") who purchased or otherwise acquired Sequenom securities from June 4, 2008 through April 29, 2009, inclusive (the "Class Period"), and who were damaged thereby, excluding Defendants herein, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of Sequenom, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

35.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at the present time and can only be ascertained from books and records maintained by Sequenom and/or its agent(s), Plaintiff believes that there are tens of thousands of members of the Class located throughout the United States.  According to the Company's 10-K filed on or about March 12, 2009, as of February 2, 2009, there were 60,977,461 shares of Sequenom common stock outstanding.  Throughout the Class Period, Sequenom common stock was actively traded on NASDAQ.

36.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained extremely competent counsel experienced in class actions and securities litigation and intends to prosecute this action vigorously.  Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

37.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class purchased Sequenom securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as allege herein;

(b)     Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

(c)     Whether Defendants had knowledge of (or were reckless with respect to) the improper activities described herein;

(d)     Whether the statements disseminated to the investing public, including investors in Sequenom, during the Class Period omitted and/or misrepresented material facts about the Company's true financial condition, business operations and future business prospects;

(e)     Whether Defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

(f)     Whether the market price of Sequenom's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(g)     Whether Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.  Plaintiff does not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

40.    The names and addresses of the record owners of the shares of Sequenom common stock and other securities purchased during the Class Period are available from Sequenom and/or its transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired Sequenom common stock by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

41.    The market for Sequenom securities was open, well-developed and efficient at all relevant times for the following reasons (among others):

(a)    The Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ;

(b)    As a regulated issuer, Sequenom filed periodic public reports with the SEC;

(c)    Sequenom regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    The market reacted to public information disseminated by Sequenom;

(e)    Sequenom was followed by numerous analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers

1    of their respective brokerage firms.  Each of these reports was publicly available and entered the

2    public marketplace;

3            (f)      The material misrepresentations and omissions alleged herein would tend to

4    induce a reasonable investor to misjudge the value of Sequenom securities; and

5            (g)      Without knowledge of the misrepresented or omitted material facts, Plaintiff

6    and the other members of the Class purchased or otherwise acquired Sequenom securities between

7    the time Defendants made the material misrepresentations and omissions and the time Defendants'

8    fraud was disclosed, during which time the price of Sequenom securities was inflated by

9    Defendants' misrepresentations and omissions.

10           42.      As a result of the foregoing, the market for Sequenom securities promptly digested

11   current information regarding the Company from all publicly available sources and reflected such

12   information in Sequenom's securities prices.   Under these circumstances, all purchasers and

13   acquirers of the Company's securities during the Class Period suffered similar injury through their

14   purchase or acquisition of Company securities at artificially inflated prices, and a presumption of

15   reliance applies.

16                           **INAPPLICABILITY OF SAFE HARBOR**

17           43.      As alleged herein, Defendants acted with scienter in that they: (a)  knew, at the time

18   that they were released, that the public documents and statements issued or disseminated in the

19   name of Sequenom were materially false and misleading or omitted material facts; (b) knew that

20   such statements or documents would be issued or disseminated to the investing public; (c) knew

21   that persons were likely to reasonably rely on those misrepresentations and omissions; and (d)

22   knowingly and substantially participated, or were involved in, the issuance or dissemination of

23   such statements or documents as primary violations of the federal securities law.

24           44.      As also set forth herein, Defendants, by virtue of their: (a) receipt of information

25   reflecting the true facts regarding Sequenom; (b) control over, and/or receipt of Sequenom's

26   allegedly materially misleading misstatements; and (c) access to confidential proprietary

27   information concerning Sequenom were informed of, participated in and knew of the fraudulent

28   scheme alleged herein.   With respect to non-forward-looking statements and/or omissions,

1  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information

2  which they caused to be disseminated to the investing public.

3      45.    Defendants' false and misleading statements and omissions do not constitute

4  forward-looking statements protected by any statutory safe harbor.  The statements alleged to be

5  false and misleading herein all relate to facts and conditions existing at the time the statements

6  were made.  No statutory safe harbor applies to any of Defendants' material false or misleading

7  statements.

8      46.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any

9  "forward-looking" statement pled herein, Defendants are liable for false forward-looking

10  statements because, at the time each forward-looking statement was made, the speaker knew or had

11  actual knowledge that the forward-looking statement was materially false or misleading, and the

12  forward-looking statement was authorized and/or approved by a director and/or executive officer of

13  Sequenom who knew that the forward-looking statement was false or misleading.  None of the

14  historic or present tense statements made by Defendants was an assumption underlying or relating

15  to any plan, projection or statement of future economic performance, as they were not stated to be

16  such an assumption underlying or relating to any projection or statement of future economic

17  performance when made nor were any of the projections or forecasts made by Defendants

18  expressly related to or stated to be dependent on those historic or present tense statements when

19  made.

20  **CONTROL PERSON ALLEGATIONS**

21      47.    At all relevant times during the Class Period, the Individual Defendants were

22  controlling persons of Sequenom within the meaning of §20(a) of the Exchange Act.  By reason of

23  their management positions as top executive officers of the Company, the Individual Defendants

24  were controlling persons of Sequenom and had the power and influence, and exercised the same, to

25  cause it to engage in the illegal conduct complained of herein.

26      48.    The Individual Defendants, by virtue of their high-level positions within the

27  Company, directly participated in the management of the Company, were directly involved in the

28  day-to-day operations of the Company at the highest levels and were privy to confidential

proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

49.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

50.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

51.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

## LOSS CAUSATION

52.    Throughout the Class Period, the price of Sequenom's securities was artificially inflated as a direct result of Defendants' fraudulent misrepresentations regarding the Company's financial condition and results.

53.     The Company's financial condition and results constitute material information to Plaintiff and the other members of the Class.  Had the truth been disclosed to the market at or before the end of the Class Period, Plaintiff and the other Class members would not have purchased Sequenom stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

54.     When the truth about the Company was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was swiftly eliminated from the price of Sequenom's securities, causing significant losses to Plaintiff and the other Class members.

55.     The decline in the Company's securities price following the revelations of Sequenom's fraudulent practices, and the resulting losses suffered by Plaintiff and the other members of the Class, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities price to reflect the newly emerging truth about Sequenom's condition.

56.     Defendants' fraudulent conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## COUNT I

### Violations of §10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder

### (Against All Defendants)

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     This Count is asserted by Plaintiff on behalf of himself and the Class against all Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

59.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and

1    maintain the market price of Sequenom's securities; and (c) cause Plaintiff and other members of

2    the Class to purchase or otherwise acquire Sequenom's securities at artificially inflated prices. In

3    furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them,

4    took the actions set forth herein.

5         60.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

6    untrue statements of material fact and/or omitted to state material facts necessary to make the

7    statements not misleading by use of means or instrumentalities of interstate commerce; and (c)

8    engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the

9    purchasers and acquirers of the Company's securities in an effort to maintain artificially high

10   market prices for Sequenom's securities in violation of §10(b) of the Exchange Act and Rule 10b-

11   5.

12        61.    As a result of Defendants' making and/or their substantial participation in the

13   creation of affirmative statements and reports to the investing public, Defendants had a duty to

14   promptly disseminate truthful information that would be material to investors in compliance with

15   the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R.

16   §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with

17   respect to the Company's operations and performance so that the market prices of the Company's

18   publicly traded securities would be based on truthful, complete and accurate information.

19   Defendants' material misrepresentations and omissions as set forth herein violated that duty.

20        62.    Defendants engaged in the fraudulent activity described above knowingly and

21   intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

22   and the Class. Defendants knowingly caused their reports and statements to contain misstatements

23   and omissions of material fact as alleged herein.

24        63.    As a result of Defendants' fraudulent activity, the market price of Sequenom was

25   artificially inflated during the Class Period.

26        64.    In ignorance of the true financial condition of Sequenom, Plaintiff and other

27   members of the Class, relying on the integrity of the market and/or on the statements and reports of

28

Sequenom containing the misleading information, purchased or otherwise acquired Sequenom securities at artificially inflated prices during the Class Period.

65.     The market price of Sequenom's securities materially declined upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

66.     Plaintiff's (and the Class') losses were proximately caused by Defendants' active and primary participation in Sequenom's scheme to defraud the investing public. Plaintiff (and the members of the Class) purchased Sequenom securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Sequenom securities through their misconduct as described herein. Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses. Plaintiff's (and the Class') losses were a direct and foreseeable consequence of Defendants' failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Sequenom.

67.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Sequenom securities during the Class Period.

## COUNT II

### Violation of §20(a) of The Exchange Act

### (Against the Individual Defendants)

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     As alleged herein, the Individual Defendants acted as controlling persons of Sequenom within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their positions with the Company and their direct control of Sequenom's operations and virtually all public communications with shareholders, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Sequenom's internal reports, press releases, public filings and other statements alleged by

1   Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the

2   ability to prevent the issuance of the statements or cause the statements to be corrected.

3        70.    In particular, the Individual Defendants had direct involvement in the day-to-day

4   operations of the Company and therefore, are presumed to have had the power to control or

5   influence the activities giving rise to the securities violations as alleged herein, and exercised the

6   same.

7        71.    As set forth above, the Individual Defendants and Sequenom committed a primary

8   violation of §10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this

9   Complaint.  By virtue of their positions as controlling persons of the Company, the Individual

10   Defendants are therefore liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate

11   result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class

12   suffered damages in connection with their purchase or acquisition of Sequenom securities during

13   the Class Period.

### PRAYER FOR RELIEF

15       WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief and judgment,

16   as follows:

17       A.    Determining that this action is a proper class action;

18       B.    Awarding compensatory damages in favor of Plaintiff and the other Class members

19   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

20   wrongdoing, in an amount to be proven at trial, including interest thereon;

21       C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

22   action, including counsel fees and expert fees; and

23       D.    Awarding such other and further relief as the Court may deem just and proper.

24

25

26

27

28

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims set forth herein.

Dated: May 4, 2009

**FARUQI & FARUQI, LLP**

By: _Vahn Alexander_

Vahn Alexander

1901 Avenue of the Stars, Second Floor
Los Angeles, CA 90067
Tel: (310) 461-1426
Fax: (310) 461-1427
Email: valexander@faruqilaw.com

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, Tenth Floor
New York, NY 10017-6531
Tel: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com

Maya S. Saxena
**SAXENA WHITE P.A.**
2424 North Federal Highway
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3382
Email: msaxena@saxenawhite.com

*Attorneys for Plaintiff*

## CERTIFICATION OF MICHAEL SCHWARTZ
## IN SUPPORT OF CLASS ACTION COMPLAINT

Michael Schwartz ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint prepared by counsel and has authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed Class Period, plaintiff executed the following transactions relating to Sequenom, Inc.:

Purchase of 200 shares at $17 1/4 per share on 02/04/09

5. In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs

and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

May 4, 2009

MICHAEL SCHWARTZ

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED
09 MAY -4 PM 4:09

## I. (a) PLAINTIFFS

Michael Schwartz, Individually and on Behalf of All Others Similarly Situated.

## DEFENDANTS

Sequenom, Inc., Harry Stylli, Paul Hawran, Allant T. Bombard, Charles R. Cantor, and Elizabeth Dragon.

**(b)** County of Residence of First Listed Plaintiff  **Kings County, NY**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **San Diego County, CA**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Vahn Alexander (167373), Faruqi & Faruqi, LLP, 1901 Ave. of the Stars, Second Floor, Los Angeles, CA 90067, Tel: (310) 461-1426

Attorneys (If Known)

'09 CV 0951 JM   BLM

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | LABOR | SOCIAL SECURITY | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | IMMIGRATION | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a).

Brief description of cause:
Securities Class Action against Defendants for issuing false and misleading statements.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
75,000.00 (Rx cess of)

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE  Hon. Barry T. Moskowitz   DOCKET NUMBER  3:09-cv-00921-BTM-WMC

DATE
05/04/2009

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

CR



JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS000396
Cashier ID: sramirez
Transaction Date: 05/04/2009
Payer Name: KNOX ATTORNEY SVCS.
----------------------------------
CIVIL FILING FEE
 For: SCHWARTZ V. SEQUENOM
 Case/Party: D-CAS-3-09-CV-000951-001
 Amount:        $350.00
PAPER COPIES
 For: SCHWARTZ V. SEQUENOM
 Amount:        $2.00
----------------------------------
CHECK
 Check/Money Order Num: 5315
 Amt Tendered: $352.00
----------------------------------
Total Due:       $352.00
Total Tendered: $352.00
Change Amt:      $0.00


There will be a fee of $45.00
charged for any returned check.
```